## ILLINOIS CENTRAL RAIL ROAD CO.

### v.

## SALLY NEER, ADMINISTRATRIX.

*Railroads—Personal Injuries—Wild Trains—Running of Trains Under Special Instructions—Rules and Regulations—Usage and Practice—Failure to Give Notice—Position of Trains—Contributory Negligence—Evidence—Instructions.*

1. In the running of trains, no order inconsistent with due care for the safety of persons or property, should be made or obeyed.

2. Special orders to make a run within a specified time are not absolute, but must be executed with a view to the exigencies of the case.

3. A special order may be assumed to supersede a standing rule only where they in terms conflict, or where it is or should be foreseen that its execution will be incompatible with such standing rule.

4. Where its incompatibility with the standing rule arises from the happening of e ents which could not have been foreseen, and not caused by the action of the giver of the order, with reasonable ground to expect that effect, the special order must yield.

5. The question as to whether the system of a railroad company in the movement of its trains is consistent with due care, is for the jury.

6. In an action brought to recover damages from a railroad company for the death of one of its servants, alleged to have been caused by its failure to give notice of the position of a preceding train, this court holds that the fifty-four claimed instances of the giving of such notice out of 11,000 orders touching the movement of trains over the same piece of road within a specified time, can not be relied upon as establishing such to be the practice of the company.

7. In the case presented, it is *held:* That an instruction to the effect that, as it was not reasonably possible to carry out both the special order and the general rule, it was for the jury to decide which should have been obeyed, was erroneous; that there can be no recovery on the ground of failure to give notice, such failure being consistent with the long established usage of the company; that such usage was prudent and proper; that it was known to deceased; that the dangers thereof were assumed by him; and that the accident in question was the result of his own negligence.

[Opinion filed June 27, 1889.]

APPEAL from the Circuit Court of Champaign County; the Hon. C. B. SMITH, Judge, presiding.

Mr. J. S. Wolfe, for appellant.

Deceased and train-master or dispatcher were fellow servants. Their employment at the time had for its immediate object a common end or purpose, namely, the movement of the train, and this constituted them fellow servants. Abend v. T. H. & I. R. R. Co., 111 Ill. 211. They were "co-operating" with each other completely, as if all had been on the train, in the particular business of moving the train. Their business was in the "same line of employment," but stronger yet—doing "the same precise thing." This made them fellow servants. C. & N. W. R. v. Moranda, 93 Ill. 302; C. & A. R. R. v. May, 108 Ill. 288; C. & E. I. R. R. v. Geary, 110 Ill. 383.

Deceased knew the hazards of the business as it was conducted. His injury was the result of a known danger, and defendant is not liable. Spafford v. C., B. & Q. R. R., 114 Ill. 247. He can not recover because a safer mode might have been adopted. Simmons v. Chicago & T. R. R., 110 Ill. 340. Generally the injured servant must have used ordinary care, not only at the exact time of danger, but in time to avoid danger, otherwise it would not be care. C., B. & Q. R. R. v. Johnson, 103 Ill. 520; C., B. & Q. R. R. v. Rogers, 17 Ill. App. 638. But in this case the deceased, on approaching the station of Savoy, was bound to use more than ordinary care. He was bound to observe appellant's rule 10, and the essential element of safety in that rule is that "great care" must be used. This rule is neither modified nor dispensed with by the facts in the case at the time and place of the collision. I. C. R. R. Co. v. Neer, Appellate Court, 3d Dist. Opinion filed November 18, 1887. The running of railroad trains is a matter out of the scope of the common knowledge of men, and the opinions of persons skilled therein are admissible. Rogers' Expert Evidence, sections 107–108, pages 145–146.

Messrs. Gere & Philbrick, and J. W. Langley, for appellee.

"It is the duty of a railroad corporation to prepare a time-table, and to adjust the running of its trains so as to avoid collisions. It must also devise some suitable and safe method

by which to run special and irregular trains, and regular trains when off their regular time. That can not be done by general rules." Darrigan v. N. Y. & L. E. R. R. Co., 52 Conn. 285.

"It is those risks alone which can not be obviated by the adoption of a reasonable measure of precaution by the master that the servant assumes." Pantzar v. Filly Foster Min. Co., 99 N. Y. 369.

"A railroad company is bound to regulate the time and manner of running its trains so as to avoid collisions, and to enable all its servants to know when a train may be expected, and thus to avoid danger." Shearman & Redfield on Neg., 2d Ed., Sec. 93.

"It is the duty of a railroad company to adopt such rules and regulations for the running of their trains as would be reasonably safe, and if it has adopted such rules, then it must conform to them, or be responsible for the consequences resulting from a departure from them, unless it used reasonable care to avoid accidents which might occur from such departure." C., B. & Q. R. R. Co. v. George, 19 Ill. 517; Railway Accident Law, 316, 317; Shearman & Redfield on Negligence, 2d Ed., Sec. 89 and notes 2, 3 and 4.

"When the movement of trains by telegraph is left to the discretion of a division superintendent, or train-master, it is his duty to so regulate their running time as to insure safety against collision." C., B. & Q. R. R. Co. v. McLallen, 84 Ill. 114.

"The peremptory order of the train-master that the train must be brought through within a specified time, was an assurance that the track would be safe for the journey, and required the train-master to take reasonable precautions to make it so." Sheehan v. N. Y. C. & H. R. R. Co., 91 N. Y. 340.

"As between servant and employer, the latter is bound to use reasonable care in the prosecution of the business in which he engages the former; and it can not be made out upon principle, or from any cases of authority, that he shall not be liable for damages arising from a failure to do so." Sheehan v. N. Y. C. & H. R. R. Co., 91 N. Y. 334; Flike v. The B. &

A. R. R. Co., 53 N. Y. 554; Cone v. Delaware, etc., R. R. Co., 81 N. Y. 206.

"Where the negligence of the company is the proximate cause of the injury, contributory negligence of a fellow servant is no defense." Grand Trunk Ry. v. Cummings, 106 U. S. 700; Stringham v. Stewart, 100 N. Y. 526; Cone v. D., L. & W. Ry.; 81 N. Y. 208; Railway Accident Law, 337.

"The train-master and his assistants, in relation to train men, are vice-principals. They stand in place of and act for the master. Their negligence is the master's negligence." C., B. & Q. R. R. Co. v. McLallen, 84 Ill. 109; Sheehan v. N. Y. C. & H. R. R. Co., 91 N. Y. 332; Darrigan v. N. Y. & N. E. Ry., 52 Conn. 285.

"A master is always liable for negligence in respect to such acts and duties as he is required to perform and discharge as master." Flike v. Boston R. R. Co., 53 N. Y. 553.

"A master can not relieve himself from damages occasioned by his own negligence by contract either expressed or implied." Lake Shore & M. S. R. R. Co. v. Sprangler (Ohio), 8 N. E. 467; Kansas Pacific Ry. Co. v. Peavy, 29 Kas. 169; Little Rock & Ft. S. Ry. Co. v. Eubanks, 3 S. W. 808; Railroad Co. v. Lockwood, 17 Wall. 357.

Where one duty is imposed upon an employe by a railroad company, and afterward another duty is assigned to him, without expressly relieving him from the performance of the first duty, the question whether the assignment of this second duty relieves him from the performance of the first duty is a question of fact, to be submitted to the jury upon the evidence, and is not a question of law. Union Pacific Ry. Co. v. Fray, 29 A. & E. R. R. Cases, 309.

A special order from train-master to vary from time card time, supersedes the general rule to maintain the time card time. A special order to run faster than fifteen miles an hour supersedes the general rule limiting freight trains to fifteen miles per hour. Likewise a special order directing a train to be brought through in a specified time supersedes all general rules in conflict with the special order. Sheehan v. N. Y. C.

& H. R. Co., 91 N. Y. 334; C., B. & Q. R. R. Co. v. McLallen, 84 Ill. 109; Darrigan v. N. Y. &. N. E. R. R. Co., 52 Conn. 285.

PLEASANTS, J. The declaration in this case sets forth that James A. Neer, a locomotive engineer in the employ of the defendant company, on the 22d of November, 1886, at 10:30 o'clock A. M., left Centralia with a train which was to be moved and run, not according to any time-table, but under special directions from the train-master, and therefore called a wild train, composed of nineteen cars of cattle and three of dead freight, under an order to make the run to Champaign City in seven and a half hours; that he followed a regular freight train, which, by its time card, was to leave the same place at 4:25 A. M. and arrive at Savoy, the station next south of Champaign, at 1:20, and at Champaign at 1:40 P. M.; that this train was so delayed, by specific direction of the defendant, as to be at Savoy at 6:05 P. M., and that although the defendant had a train-master and a train-dispatcher at Champaign, and a line of telegraph all the way, with operators at each end of the run and at intermediate stations, it negligently failed to advise the deceased of its delay and position; by reason whereof, without any want of due care on his part, he ran his train into it. at said station and was killed by the collision. The plea was not guilty.

A former judgment herein was reversed by this court because of an erroneous instruction given for the plaintiff. In the opinion filed the case was stated fully enough to show the error found, and the views of the court were also incidentally expressed upon some other points, then and now involved. 26 Ill. App. 356. The second trial was had, by agreement, upon the evidence in the bill of exceptions taken on the first, with some additional testimony which did not materially change its aspect; and the result was a verdict for the plaintiff for $5,000, which the court below refused to set aside. From the judgment entered thereon this appeal was taken.

It seems that the instructions given on this trial were prepared by the court. Counsel has criticised them with somewhat unusual severity. We think their faults are mostly ver-

bal, but do not propose to consider them particularly, because, whatever view may be taken of them, the case, in our opinion, is in condition to be decided upon the merits as shown by the evidence. The questions involved are those of due care or culpable negligence on the one side and the other, and the evidential facts are undisputed. Those averred in the declaration are admitted, and others are shown as follows:

Between Centralia and Champaign City, a distance of one hundred and twenty-three miles, there were twenty-seven stations of all classes, nine railroad crossings on grade, four places for taking water, and one for coal. Deceased had been employed on that run for twenty years. He had pulled this wild train thirty times, making the run once in six hours and thirty-five minutes, seven times in seven hours and thirty minutes to eight hours, and five times in eight to eight hours and thirty minutes—his longest time being ten hours and fifteen minutes, and his average eight hours and thirty-four minutes. On the day of the accident he was delayed by stops and slowings nearly two and a half hours. He had also pulled the regular (New Orleans way freight), which was known as No. 22, on sixty runs, of which he made only six in card time, and was late on the others from one to seven hours. When it was late at Champaign it was generally late out of Centralia, the variation in time from Centralia being mainly due to the fact that it was sometimes a "through" and sometimes a "way" freight from that point, its character depending on the load it carried. It had been passed by the wild only twice before this accident, and on neither of those occasions was the deceased on either. On the day in question, its conductor received at Effingham, fifty-three miles north of Centralia, an order from the train-master to "pick up all the loads he could find and the engine was able to haul." Deceased was well aware of its liability to such delays, and of the irregularities in the time of its arrival and the length of its stops at the various stations on the run. On that day he was advised by the register at Effingham that it had left that station at 10:25, being an hour and three quarters behind its card time. There was no registering station between that and

Champaign, and though it does not appear whether he did or did not, after leaving there, get any information as to its whereabouts until just before the collision, it is certain that he received none from the train-master.

The last report of these trains to that officer before the collision was that the regular left Tolono, the station next south of Savoy, and the wild left Hayes, the second station south of Tolona, at the same time. According to its card, the regular was due at Hayes at 12:32 and at Tolono at 1:04, so that it was thirty-two minutes ahead of the wild on its own prescribed run of one hour and eight minutes from Hayes to Champaign ; and so, from that report, the train-master may have had no apprehension of its being overtaken. Savoy was a flag station for passenger trains, having one side track, with a switch at each end. Regular local freights usually stopped there. Through freights, having no work there, did not, unless flagged. Wild and other trains often passed it at full speed. Its distance from Tolono was a little over five miles. Between them the track was straight, slightly descending to the north, and free from all obstructions to the view. The day of the accident was rainy and at times foggy, requiring frequent attention from the deceased to keep his cab window clear. His fireman observed that he repeatedly wiped it, but whether between those stations he did not notice or recollect. He ran there at the rate of about twenty-five miles to the hour.

The regular stood on the main track at Savoy. It was dark and still raining, though not hard, and the fog had raised. Red lanterns with lard oil lamps—all in good condition, with clear globes and burning well—were hanging from the sides and from the rail at the rear end of the caboose. Such lights are as visible in the dark as in the dusk, and can be seen at a distance of half a mile or more. The conductor saw the head-light of the wild at about that distance, his attention being first attracted by the noise of the coming train. His brake-man immediately started back with a red lantern to arrest it if possible, and ran four or five hundred feet before his signal was answered and the whistle sounded for brakes; but the

train was then within twenty-five car lengths of the station and the collision was inevitable. Another freight train, which the wild passed at Tolono, followed it in a few minutes, and its engineer had no difficulty in seeing the lights at Savoy and stopping his train before reaching it, although he also was running at the rate of twenty-five miles per hour.

On behalf of appellee, it is contended that the company, having imperatively ordered the wild to make the run in seven and a half hours, and by a later order to the regular caused its unusual delay, virtually gave to both trains the right, in the absence of notice, to occupy the same point on the track at the same time, and knowing that freight and wild trains often passed Savoy without slowing, was, by its means of knowledge, in duty bound to know the danger of the situation there, and by proper notice and directions to guard against it; and that its employes on the wild train, who were dutifully endeavoring to execute a specific and imperative order, were especially entitled to such protection.

A standing rule of the company, known as No. 10, required that " all trains, when approaching stations, watering or coaling places, must do so with great care, expecting to find some train occupying the main track.  *  *  *  This rule is not intended to excuse employes from exhibiting the proper signals, as provided in rules 7, 9, 11 and 12, but is an extra precaution to prevent accident." Another declares that "safety demands that all persons connected with the movement of trains by telegraph should use the utmost care and watchfulness," which would seem to apply as well to those in charge of such trains as to those who operate the telegraph.

Appellant further claims that these rules were emphasized by the established and well understood practice under its system of train movement. That practice was to give no notice whatever to any train of any other train ahead or following, of the same class, even as to trains running against each other, that is, in opposite directions. If they are regular, running on time card and adhering closely to their schedule, no notice is given; though, if any have lost their table rights,

or are to meet other than regular trains on time, the meeting points are made by telegraphic order. But where trains of the same class are going the same way, neither is notified of the other, although the one following is to make faster time than the other, and must overtake it. Here the two trains were of the same class.

That such has been the established practice of this company for at least seventeen years, and well known to its employes, was positively shown by the direct testimony of many witnesses, and none such was offered to contradict it. These witnesses, and many others, of the largest experience and holding the most responsible positions on other leading roads—the Burlington, the Alton and the North-Western—further testified, without contradiction, that this system has been adopted on all those roads, and is a better and safer system than one which would warrant the expectation of notice in such cases. Some of the reasons assigned are, that on great roads like these, where such trains are so numerous and have so many stopping places, no one man should be responsible for all their movements. It would impose upon him too great a burden, and expose them to too many risks. He must always be without prompt information of delays and obstructions between stations, and often, also, of delays and obstructions at stations, by neglect of conductors and telegraph operators to report, and still more by interruption and derangement of the telegraphic apparatus, especially in time of storm. The exposure of trains at such times from reliance on a system of notice would be greater than that of the whole time under one which makes their safety depend on the vigilance and care of those in immediate charge.

The Legislature has not prescribed any specific rules for the movement of railroad trains. The courts have no power to do so, nor are they qualified to exercise it. They can do no more than declare the degree of care to be observed in the adoption and execution of such rules, and hold the companies liable for injurious consequences of their failure to observe it. Whether the system of appellant was consistent with due care was a question for the jury. But it was to be determined

Illinois Central R. R. Co. v. Neer.

upon the evidence, in reference to which, on the former ap-
peal, we said that "whether this reasoning and these opinions
should be adopted or not, there is in this record really no con-
flict in the evidence as to the propriety of the rule; and if the
practice of the appellant is to be condemned, it must be upon
a conclusion reached independent of and discarding the opin-
ions of these expert witnesses. We think that neither the
court nor jury has such knowledge of the subject-matter as to
justify such a conclusion."

Upon the point thus mentioned, the proof in the present
record is the same ; but respecting the actual practice of the
company the plaintiff introduced on this trial forty-seven
instances, in addition to seven produced on the first, of what
are claimed to be such notices, given by the train-master.
They are telegrams, varying in forms of expression, of which
some are not clear as to their bearing upon the question, and
the circumstances to which they applied are not fully shown.
There is reason, from the evidence, to think that in many cases
the trains were not of the same class. Assuming, however,
that they were all inconsistent with the rule of practice
claimed by appellant, we think it would be impossible to dis-
cover from them what particular condition, or that any par-
ticular condition of such trains would make them recognized
exceptions to that rule ; and the inference would be that
these cases were so peculiar that as to them the train-master,
of his own will and for his own rea ons, but not according to
any prescribed or established practice, departed from it.

They were taken from books containing about eleven thou-
sand orders and messages sent in the course of three years to
employes running trains between Centralia and Champaign,
and presumably are all that were supposed to support appel-
lee's contention on this point.

From these few instances contrary to the general course,
even if they had all been known to deceased, he would not
have been justified in relying upon notice on the occasion in
question.

Upon the facts above stated, which are all that now occur
to us as material, the jury must have found that he used ordi-

nary care in approaching and coming into the station at Savoy, and that the failure of appellant to give him notice of the position there of No. 22 was negligence.

It is not pretended, however, that he complied with rule 10 as it would be construed in application to other trains; but the claim is that as to his, on that occasion, it was superseded or suspended by the special order to him to make the run in seven and a half hours. It is said that this was impracticable without disregarding the standing rule, and that the special order was imperative, in the sense of being absolute, and therefore that it authorized him to presume, in the absence of notice to the contrary, that the track was c'ear. The argument assumes that to have observed that rule he must have stopped or slowed up at each of the forty-one stopping places on the run. But what it required, and all that it required, was only that in approaching stations, and watering and coaling places, " great care should be used" with reference to the possibility of finding " some train occupying the main track," which might be fully observed without either stopping or slowing at such places, wherever, by a timely lookout, it could be seen that the track was not so occupied. It is quite probable that such care in looking out, rather than a relaxation or disregard of the rule, accounts for the frequent passing of Savoy at full speed. There the track was straight, and the view unobstructed for a greater distance than was required for making a stop. Whether this was true of other stations does not positively appear, but it certainly is not improbable.

We apprehend that special orders to make runs in a specified time are never absolute. Of necessity they must be conditional, and their execution must be undertaken with that understanding.

The company has no right to give, nor its employes to execute, any order which is inconsistent with due care for the safety of persons and property affected by it.

We hold, also, as a rule of construction, that a special order will supersede a standing rule only where they in terms conflict, or where it is or ought to be foreseen, when given, that its execution is incompatible with the latter, or becomes so

afterward by some action of the giver, taken with reasonable ground to expect that effect. In such cases the intention to supersede it may be fairly presumed. But where such incompatibility arises only upon unforeseen events not so brought about, whatever exceptions should be allowed in view of their comparative importance in particular cases, as a rule, the special order must yield.

There is no evidence in the record tending to prove that the train-master, when he gave the special order, had any reason to apprehend that its execution would be impracticable without disregarding the standing rule. The time therein designated for the run was only an hour less than the average time of deceased upon it. He had made it in that time, and often within half an hour of it; and it does not appear that on any of those occasions it was found necessary to disregard the standing rule. On the occasion in question the load he hauled was nearly all " through " freight, so that no unusual delay on its own account was probable.

Nor is there any reason to suppose that when the order to the conductor of No. 22 at Effingham was given, it was, or ought to have been known, that its execution would put that train in the way of the wild. Its card time at Champaign was four hours and a quarter ahead of that designated for the wild; and although it had left Centralia two hours and a half late, it had made up forty-five minutes in the run to Effingham. The order to it, heretofore quoted in part, was, in full, as follows: " When you found you had one load for Effingham, why did you not take one load from there, so as to make full train? I don't want you to run over the road unimportant freight without full train. If any empty twenty-ton box cars at Mattoon, take them to Arcola, and pick up all the loads you can find and engine is able to haul." From which it is clear he did not then know there were any such empty cars at Mattoon, nor how many loads the conductor could pick up or haul. Hence he had no reason to expect it would be overtaken by the wild, nor that, if it should be, it would endanger or obstruct that train, but rather that it would be safely passed as was the other regular at Tolono, of which also the wild had no notice, except that it was somewhere ahead.

It would seem from the evidence, that a moving train ahead, if able to make its own proper time, is not regarded by railroad men as an obstruction to a faster one following, probably for the reason that each would almost necessarily get notice of the other by seeing or hearing it in time to so increase the speed of the one and reduce that of the other as to avoid a collision; and if the one ahead should become disabled between stations, the one following would be advised of it either by telegraph or by special signal sent back for that purpose. The danger appears to be from a train ahead standing at a station, and so unable to get out of the way of one coming in at full speed without notice. Hence the great importance of such a rule as No. 10. If not framed with special reference to such cases, it had its most forcible application to them; and in the light of the evidence, it is apparent that its usefulness would be greatly impaired by anything that would. lead the following train to expect notice, from the train master, of the one ahead.

We see nothing in the special orders or any other action of the train-master, indicating an intention or making an occasion to supersede or suspend that rule; nor anything in the condition or circumstances of the wild train to exempt it from the rule of practice as to notice. In our opinion, therefore, the proposition contained in paragraph fourteen of plaintiff's instructions, " that if you believe it was not reasonably possible for him to obey the general rules and also the special order, then it is for the jury to say, under all the evidence, which he ought to have observed," was erroneous. It certainly was not possible for him, at the time of the collision, reasonably or unreasonably, to comply literally with both; and so the jury justified him in disregarding the standing rule. This seems to be the only explanation of their verdict, but the impossibility consisted alone in the fact that he had already failed as to the special order. The time specified in it had already passed, and in this literal sense he could have no choice as to which he ought to observe. It was possible to comply with the standing rule only. And for aught that appears, this may have been due to his own fault. A differ-

ence of fifteen or twenty minutes in the whole run would have enabled him to comply with both. But if he had previously made the best time he could, and could have reached Champaign in the time ordered by disregarding the standing rule at Savoy, and only by so doing, it would have been his duty to approach that station with the care required by the rule. The making or saving of a few minutes of time, under the circumstances shown, would not have justified or excused the risk he took in disregarding it.

We find, and think the jury were bound to accept as facts proved without contradiction, that the omission of notice to the wild train of the position of the regular, was in accordance with the general method of the company in the movement of such trains; that this method was known to the deceased, and that with such knowledge he voluntarily continued in its service and assumed the risks incident to it; that it was a prudent and proper method, and adherence to it in this case was not negligence; that the deceased, in approaching the station at Savoy as he did, failed to use ordinary care for his own safety, irrespective of rule 10, and clearly violated his duty as expressly imposed by it.

Our judgment being based in part upon such finding, differing from that of the jury, the clerk will recite therein the facts so found.

For the reason above given, the judgment of the Circuit Court will be reversed.

*Judgment reversed.*