## ST. LOUIS & S. F. R. CO. v. DEWEES.[*]

(Circuit Court of Appeals, Eighth Circuit. April 24, 1907.)

### No. 2,360.

**1. TRIAL—QUESTION FOR COURT OR JURY—NEGLIGENCE—DIRECTION OF VERDICT.**

It is undoubtedly true that cases are not lightly to be withdrawn from the jury, and that ordinarily negligence is so far a question of fact that it should be submitted to and determined by them; but it is equally true that when the evidence and the inferences to be reasonably drawn

[*] Rehearing denied June 10, 1907.

from it are undisputed, or are of such conclusive character that the exercise of a sound judicial discretion would permit the court to give effect to but one verdict, the case may and should be withdrawn from the jury and a verdict directed for the plaintiff or the defendant, as the one or the other may be proper.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 46, Trial, §§ 377, 379.]

2. MASTER AND SERVANT—RULES—OBEDIENCE BY SERVANT.

Where the duties of a servant in given circumstances are particularly specified in the unambiguous and reasonable rules of the master, of which the servant has knowledge and to which he has assented by entering and continuing in the service, his nonobservance or disobedience of them at a time when they are capable of observance is negligence as matter of law, and is not to be judged by the undefined and varying requirements of ordinary care.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, § 759-775.]

3. SAME—RULES—REASONABLENESS—VIOLATION—NEGLIGENCE.

Rules of a railroad company requiring the engineer to keep a careful lookout for signals, to stop the train when a signal is not understood, or is imperfectly displayed or absent from its usual place, and expressly requiring that he "must know," when approaching a switch, that it is in proper position, are reasonable and valid. And where the engineer, in approaching a known switch, at which designated and known signals were customarily displayed to indicate whether the switch was closed or open, either took proper observations, learned that the switch was open, and took chances upon being able to go safely through the same at great and unwarranted speed, or, knowing that he was approaching the switch, and not knowing whether it was closed or open, took chances on its being in proper position, and so drove into the switch when it was open, whereby the train was wrecked and he was killed, *held,* he was guilty of contributory negligence, preventing a recovery for his death.

4. SAME—SPECIAL TRAIN ORDERS—EFFECT.

A wrecked train, of which intestate was the engineer being unable to conform to the regular schedule, was being run under special telegraphic orders directing it to run late, according to a special schedule therein given. The train dispatcher who issued the order testified that it "simply set the train back"; and a general rule of the company, of which the engineer had knowledge, required him to run "steadily and uniformly, adhering as closely to time as due regard for safety permits." *Held,* that such special orders should be construed merely to require the engineer to adhere to them as closely as due regard for safety permitted, and did not abrogate the standing rules of the company requiring engineers, on approaching switches, to know that they are in proper position, etc.

5. NEGLIGENCE—CONTRIBUTORY NEGLIGENCE PREVENTING RECOVERY.

One cannot—nor can one standing in his stead—recover damages for an injury to the commission of which he has directly contributed; and it matters not whether that contribution consists in his participation in the direct cause of the injury, or in his omission of duties which, if performed, would have prevented it. If his fault, whether of omission or commission, has been a proximate cause of the injury, he—as also one standing in his stead—is without remedy against another, also in the wrong.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 37, Negligence, § 84.]

Adams, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the District of Kansas.

James Black (I. P. Dana, L. F. Parker, and W. F. Evans, on the brief), for plaintiff in error.

W. R. Biddle (Hubert Lardner, on the brief), for defendant in error.

Before VAN DEVANTER and ADAMS, Circuit Judges, and PHILIPS, District Judge.

VAN DEVANTER, Circuit Judge. This was an action under a Kansas statute by a widow to recover damages of a railroad company for the death of her husband, Charles A. Dewees, alleged to have been caused by the negligence of the company and its employés. The plaintiff obtained a verdict and judgment, and the defendant has brought the case here; its chief contention being that there was error in refusing its request for a directed verdict. In Kansas the fellow-servant rule of the common law has been abrogated as respects employés of railroad companies. Gen. St. Kan. 1901, § 5858.

At the time of his death, Dewees was a locomotive engineer in the service of the railroad company, and was driving the engine of a northbound passenger train called the "Meteor." While proceeding at a speed of 50 or 60 miles an hour, the train was wrecked in the circumstances here stated; he and the fireman being among those who lost their lives. The accident occurred at Godfrey, a small station in Kansas, at which a passing track of considerable length lies east of the main track and is connected therewith at either end by a switch. A northbound freight train had become temporarily stalled on the main track between these switches, and they had been opened to permit other trains to use the passing track while the blockade of the main track continued. The passing track was adequately constructed for the purposes for which it was designed and used, but, as was well known, it was not designed or used to carry trains running at great speed. Three trains, a north-bound passenger and two south-bound freights, made the passage in safety. The Meteor was the fourth train to approach while the blockade continued, and was wrecked in consequence of running through the open switch at the south end of the passing track, and onto that track, at the great speed before named. East of the switch was an upright switch stand 7 feet in height. At its top was a red disk 16 inches in diameter, which, when the switch was closed, could not be seen from along the track, and, when the switch was open, presented one red face to the south and the other to the north. Above the disk was a lamp with four faces, two green and two red. When the switch was closed, one green face was to the south and the other to the north, and, when the switch was open, the red faces took the places of the green ones. The accident occurred at 4:54 in the morning, when it was dark, windy, and a little foggy. Whether the lamp in the switch stand was lighted, and whether the rear brakeman of the stalled train made use of certain prescribed signals to advise the Meteor of the existing situation, as was required by the rules of the railroad company, were subjects in respect of which the evidence was quite conflicting; so, for the present purposes, it must be assumed that the lamp was not lighted, that the prescribed signals were not given by the brakeman, and that this negligence was a proximate cause of the accident. We turn, there-

fore, to that phase of the case which relates to the conduct of Dewees.

Among the rules prescribed by the railroad company for the operation of its trains, with which Dewees was familiar and of which he carried a copy, were these:

"General Notice. * * * Obedience to the rules is essential to the safety of passengers and employés, and to the protection of property. * * *"

"(27) A signal imperfectly displayed, or the absence of a signal at a place where a signal is usually shown, must be regarded as a stop signal, and the fact reported to the trainmaster."

"(106) In all cases of doubt or uncertainty the safe course must be taken and no risks run."

"(267) Conductors and enginemen are cautioned against reckless running. They must run steadily and uniformly, adhering as closely to time as due regard for safety permits."

"(358) They [the enginemen] must keep a careful lookout on the track for signals and obstructions; look back frequently and know that their train has not parted, obey all signals, even if considered unnecessary; stop and inquire respecting signals not understood. * * *"

"(359) When approaching switches the engineer must know that they are in proper position. * * *"

"(412) The company does not require or expect its employés to incur any risk, from which, by the exercise of their judgment and by personal care, they can protect themselves, but enjoins upon them and demands that they shall take time and use the means necessary to, in all cases, do their duty in safety."

The existence and location of the station, switch, and switch stand, the character and meaning of the signals usually displayed at the switch stand, and the proper use of the passing track, were well known to all experienced engineers on that part of the road. This was Dewees' first trip on the Meteor, but he was an experienced engineer, had driven engines over that part of the road almost daily for eight or nine years, was perfectly familiar with it, and was accustomed to determining his locality by familiar objects along the road, and by its grades, curves, and other features. As he approached the station from the south, he passed different fixed objects in plain view from his side of the engine, among them being the whistling sign one mile from the station and 4,100 feet from the switch. He heeded this sign by sounding the whistle for the station, and 3,000 feet from the switch he passed from a downgrade of 6 inches to an upgrade of 9 inches to every 100 feet, and from a straight line to a one degree curve to the left. The engine was a good one, and had a strong electric headlight which shone plainly upon all objects along the road before they were reached, and lighted up the switch stand and its surroundings so as to bring them within his range of vision when they were 1,200 feet away. The engine and cars were equipped with air brakes which gave him such control over the train that, by an emergency application of the air, it could be brought to a full stop in 1,000 feet, and, by a service application, could be brought to a speed of six miles an hour in 1,200 feet, although it could pass through the switch and over the passing track in entire safety at double or treble that speed. The switch was open, and therefore not in proper position for the train to proceed at great speed. The lamp in the switch stand did not show green, the signal for a closed switch. If lighted, it showed red, the signal for an open switch; and, if not lighted, there was an absence of a signal at a place where a signal was usually shown, which, as properly conceded in the

instructions requested by the plaintiff, "was a warning." And whether or not the lamp was lighted, the red disk, 16 inches in diameter, was so turned as to show that the switch was open. While, as before said, it was dark, windy, and a little foggy, the evidence, including that for the plaintiff respecting the distances at which different lights and objects were seen at the time, makes it plain that, with the strong electric headlight on his engine, Dewees could have observed the conditions at the switch stand at any time after he came within 1,200 feet thereof. But, if the weather had prevented such observation, it would still be beyond question that he knew the relative location of the whistling sign, the switch, and the station, knew he had passed the whistling sign and at what speed he was running, did not know whether the switch was in proper position, and yet proceeded *all the way to it* at a speed of 50 or 60 miles an hour with the disastrous results before stated. He made no application of the air at his command, and his conduct was not induced by any false or misleading signals, for there was none. There was no evidence that any of the rules before set forth, or the use of the signal lamp at the switch, had been abandoned or fallen into disuse.

It is undoubtedly true that cases are not lightly to be withdrawn from the jury, and that ordinarily negligence is so far a question of fact that it should be submitted to and determined by them, but it is equally true that when the evidence and the inferences to be reasonably drawn from it are undisputed, or are of such conclusive character that the exercise of a sound judicial discretion would permit the court to give effect to but one verdict, the case may and should be withdrawn from the jury and a verdict directed for the plaintiff or the defendant, as the one or the other may be proper. Southern Pacific Company v. Pool, 160 U. S. 438, 16 Sup. Ct. 338, 40 L. Ed. 485; Patton v. Texas & Pacific Railway Co., 179 U. S. 658, 21 Sup. Ct. 275, 45 L. Ed. 361; Chicago Great Western Ry. Co. v. Roddy, 65 C. C. A. 470, 131 Fed. 712. In our opinion this was such a case. The evidence reasonably permitted of either of two conclusions, but none other: One, that Dewees took proper observations, learned that the switch was open, and took chances on being able to go safely through the same and over the passing track at great speed; the other, that, knowing he was approaching the switch, and not knowing whether it was closed or open, he took chances on its being in proper position. In either event he was culpably negligent. It is conceded that negligence is necessarily deducible from the first conclusion, but that it is thus deducible from the second is questioned, and this upon the theory that his conduct must be judged by the standard of ordinary care, and that it cannot be said as matter of law that, in attempting to pass the switch without knowing whether it was closed or open, he failed to conform to this standard. The theory is not sound. His duties in the circumstances were not left to the undefined and varying requirements of ordinary care, but were particularly specified in the rules of the railroad company of which he had knowledge and to which he assented by entering and continuing in its service. An instruction giving effect to the theory so advanced was disapproved by this court in Northern Pacific Ry. Co. v. Cummiskey, 70 C. C. A. 92, 97, 137 Fed. 508, 513, where it was said by Judge Hook:

"To the jury, therefore [that is, by the instruction], was committed the determination of the question whether ordinary care required the doing of that which the company contends it required by a specific rule applicable to the case. If the rule applied, and it imposed upon Cummiskey the duty to send a flagman or to go back himself and flag the approaching passenger train, it was error to make the existence of that duty dependent upon the conception of either court or jury of the requirements of ordinary care. There was no contention that the rule was unreasonable or that Cummiskey was not fully cognizant of it."

And to the same effect is Erie R. Co. v. Kane, 55 C. C. A. 129, 143, 118 Fed. 223, 237, where it was said by the Circuit Court of Appeals for the Sixth Circuit:

"Certainly, in so far 'as it and that part of the charge which related to the other portion of the rule left it to the jury to determine whether decedent's action was prudent and careful, even though it may have been in violation of the rule, it was erroneous. They contained the vice of the instruction disapproved by this court in the case of Railway Co. v. Craig, 73 Fed. 642, 19 C. C. A. 631; Id., 80 Fed. 488, 25 C. C. A. 585, on the last hearing herein. They left it to the jury to determine whether the violation of said portions of the rule was negligence, when the jury should have been told that such action was negligence, as a matter of law, and that, therefore, if said portion of said rule had been violated, and the violation thereof contributed to the injury, they should find for the defendant."

The rules of the railroad company not only required the engineer to keep a careful outlook for signals and laid upon him the duty of stopping the train where a signal was not understood, or was imperfectly displayed or absent from its usual place, but also expressly enjoined that, when approaching a switch, he must know that it was in proper position. To read these rules is to understand that they required him to ascertain by whatever means and by whatever use of time were necessary whether the switch was closed or open before attempting to pass it. They were unambiguous, reasonable, and designed for his protection, as also that of his fellow servants, the traveling public, and the railroad company. Their observance was therefore a matter of common concern. They were capable of observance in the circumstances, and, if observed, would have prevented the accident. He did not observe them, and this was, as matter of law, negligence. Kansas, etc., Co. v. Dye, 16 C. C. A. 604, 70 Fed. 24; Erie R. Co. v. Kane, 55 C. C. A. 129, 118 Fed. 223; Francis v. Kansas City, etc., Co., 110 Mo. 387, 395, 19 S. W. 935; Louisville, etc., Co. v. Mothershed, 110 Ala. 143, 20 South. 67; Illinois Central R. R. Co. v. Guess, 74 Miss. 170, 21 South. 50; Norfolk & Western R. R. Co. v. Williams, 89 Va. 165, 15 S. E. 522; Green v. Brainerd, etc., Co., 85 Minn. 318, 88 N. W. 974; Chicago, etc., Co. v. Flynn, 154 Ill. 448, 453, 40 N. E. 332; Lake Erie & Western R. Co. v. Craig, 25 C. C. A. 585, 80 Fed. 488. As was well said in the last case:

"The doctrine that the master operating a complicated and dangerous business may and must make reasonable rules for the guidance and safety of the employés, that the employé must yield obedience, and takes upon himself the consequences of disobedience, is a doctrine that is eminently wise, and founded upon the highest considerations of justice and humanity. The master's right to protect himself from heavy pecuniary liability in the operation of a large business is most important. His duty, by suitable regulations, such as are suggested by experience, to protect as far as may be the servant

from risk of injury to himself as well as injury from a fellow servant, for which the master is not pecuniarily liable, and for which there is practially no remedy, is a duty justly imposed by law. And the still higher considerations of the preservation of human life, and the prevention of serious physical maiming and disability with the attendant suffering and impairment of usefulness, furnish the fullest support and sanction to the doctrine. And the law knows no such incongruity as holding the master to the duty of making with the right of making, without at the same time requiring from the servant full conformity to the regulations."

But it is urged that the Meteor was running under a special order which superseded, or at least rendered inapplicable, the rules before set forth, and especially the one requiring the engineer, when approaching a switch, to know that it was in proper position. The train, being late, was unable to conform to the regular schedule, and so the train dispatcher issued the following order, which was duly communicated to Dewees, and also to the employés of other trains on that part of the road:

"No 110 [the Meteor], engine 189, will run late as follows: Leave Columbus 3:45 a. m.; Scammon 3:56 a. m.; Cherokee 4:07 a. m.; Girard 4:26 a. m.; Farlington 4:36 a. m.; Anna 4:46 a. m.; Godfrey 4:54 a. m.; Edwards 4:56 a. m.; arrive at Fort Scott 5:04 a. m."

The argument is that this was a special order requiring the stations named to be made at the times designated, and was an assurance that the track would be kept clear so that this could be done, and therefore that the engineer was relieved of the duties ordinarily imposed by the rules. This is plainly an erroneous view of the order. The train dispatcher, who issued it, in testifying as a witness for the plaintiff, said, "this order simply set the train back"; and we think it was nothing more than a special schedule, which for that occasion superseded the regular one in respect of time. It did not purport to give that portion of the road over to the running of this train alone, or to take from the employés and passengers thereon the protection which would be afforded by the rules if it were running according to the regular schedule. Nor did the order indicate that the time of the special schedule should be adhered to more closely than if it were the regular one. A rule, as before shown, made it a duty to adhere to time as closely "as due regard for safety permits," and as it made no distinction between regular and special schedules, and, as no reason for such a distinction in this instance is perceived, we think it applied equally to both, and that the qualifying clause placed regard for safety, as defined by the rules, above regard for schedule time. In ruling upon a like question, it was said in Illinois Central R. R. Co. v. Neer, 26 Ill. App. 356, 359:

"It is said he [the engineer] was under instruction to make the run within a certain time, and that he was attempting to comply with this order. All trains are under instructions to make certain time, but that does not modify or dispense with the standing rule as to the care to be observed in approaching a station."

And upon a subsequent hearing of the same case it was said (31 Ill. App. 126, 136):

"We apprehend that special orders to make runs in a specified time are never absolute. Of necessity they must be conditional, and their execution must be undertaken with that understanding."

In the case of Northern Pacific R. R. Co. v. Poirier, 167 U. S. 48, 54, 17 Sup. Ct. 741, 42 L. Ed. 72, the question arose whether a conductor, who was running in the nighttime upon special telegraphic orders without any schedule or time-card, and who was without notice that a preceding train would stop at a spur track which was not a regular station, was relieved from observing the usual rules of the railroad company, and it was held that he was not, the court saying:

"One of the plaintiff's witnesses, Allen, the rear brakeman on the first train, testified that the second train was 'running by telegraphic orders and had no schedule orders or time card.' This was doubtless true, as it is true of every 'wild' or extra train; but such a fact by no means warrants the inference drawn by the trial court and given in the charge to the jury that 'the train was running under special orders as to the time it was to make, where it was to go and when it should reach the different stations.' It cannot be justly inferred from the mere fact that the second train was a 'wild train' that its conductor was relieved from obeying the laws of the company."

And again:

"Assuredly more evidence must be given than the mere fact that the second train was a 'wild' train, not running on schedule time, to justify an inference, by either court or jury, that the conductor was relieved by such fact from regarding the rules of the company regulating the running of its train. Nor does the statement of the conductor of the second train, that he had not been notified that the first train was to stop at Clyde Spur, show that he had any right to dispense with the rules."

At Anna, the next station south of Godfrey, the Meteor met two south-bound freight trains which went upon a side track to permit the Meteor to pass, and, when it was doing so, the conductor of the second freight train gave a signal which it is claimed justified Dewees in believing the main track was clear from that point to his destination, Ft. Scott. Apart from the fact that this conductor could not know what occurred along the road after he passed over it, and could give no assurance that it would be clear when Dewees came to pass over it, the evidence in respect of this signal shows that it had no such significance as claimed. The entire evidence is as follows:

"Q. When he [Dewees] came up to your train, did you give any signal? A. Yes, sir.

"Q. What signal did you give him? A. Commonly known as the 'high-ball.' We were in the clear and I gave him the signal up and down to let him know we were in the clear.

"Q. What is the meaning of that signal. A. What I meant was that the main line was clear at Anna and that I was in the clear. That is what I meant by it.

"Q. Then he passed ahead? A. He passed by."

Thus the full significance of the signal was that this freight train had pulled into the siding at Anna a sufficient distance to be clear of the main track and to permit the Meteor to pass in safety.

It is said that the duty of keeping a careful lookout for signals did not devolve upon the engineer alone, but upon the fireman as well; that, by reason of the curve in the track, the fireman could observe the conditions about the switch stand before they could be observed

by the engineer; that he was entitled to rely upon the fireman taking proper observations, and, for aught that appears, may have acted upon inaccurate information given by the latter, or upon the supposition that, unless he advised to the contrary, the switch was in proper position. Both the engineer and fireman lost their lives in the accident, and there is no direct evidence of what, if any, observations were taken by either, or of what, if anything, transpired between them. It cannot be presumed that the fireman rather than the engineer was negligent, and there is no evidence to that effect. True, both were required to keep a careful lookout for signals, but the engineer was in charge and could direct the fireman in his work, which included other important duties, such as shoveling coal into the fire box, which prevented continual observation on his part. The duty of taking observations for the safety of the train was chiefly the engineer's, and the fireman was his assistant. The switch stand was on the engineer's side, and could be observed by him almost as soon as by the fireman, and thereafter the engineer had the better opportunity for observation. He was in control of the movement of the train, and the duty of knowing that the switch was in proper position was, by the rules, expressly laid upon him. The switch was not in proper position. The lamp at the switch stand did not show green, which alone would indicate that the switch was closed. The disk was turned so as to show red, the sign that the switch was open. And yet the engineer, knowing that he was approaching the switch, and either knowing that it was open, or not knowing whether it was closed or open, drove his engine all the way thereto and into it at a speed which was permissible only in the event that he knew it was closed. These considerations, as it seems to us, preclude any other conclusion than that he did not observe the rules and was negligent.

The distinction between the duties and situation of the fireman and those of the engineer is further indicated in the opinion of this court in the fireman's case (St. Louis & San Francisco R. R. Co. v. Bishard [C. C. A.] 147 Fed. 496, 498), where it is said:

"The company claims that, as the switch was thrown for the passing track, the lamp, if burning, must have shown the red sign of danger, and that, if it was not burning when the Meteor approached, the mere absence of a light at that customary place was in itself a sufficient warning under a rule of the company to that effect. Here arises the principal contention of contributory negligence on the part of the fireman. It is said that it was his duty, especially in approaching stations, to keep a lookout for signals, and that, as his train was moving on the curve, his position on the west side of the engine would have enabled him to look along the chord of the arc and to detect either the presence of the red light at the switch stand or the absence of any light, as the case may have been, and that in either event it was his duty to immediately notify the engineer of the result of his observations. Counsel for the company requested the trial court to charge the jury that it was the paramount duty of the fireman to keep this lookout and to warn the engineer in time to avoid the danger, and that, if he could have seen the signal in time to warn the engineer and did not keep the lookout, then the verdict should be for the defendant. The request was denied. The trial court in lieu thereof charged the jury that it was the duty of the fireman to keep the lookout when not otherwise necessarily engaged. We are of the opinion that the trial court was right. There were other important and imperative duties which the fireman was required by the rules of the company and the nature of his position

to perform. Those rules expressly placed him under the supervision and direction of the engineer, and required him to obey the orders of the latter respecting the performance of his duties. In keeping a lookout on the track for signals, he was merely an assistant acting under the direction of the engineer, and it cannot be said that upon the occasion in question it was his paramount duty to be on the lookout at any particular moment. The rules did not so provide, and we cannot infer that the engineer so ordered. Other duties of moment may have demanded his attention elsewhere. Having due regard for that presumption which obtains in the absence of evidence, a court would not be justified in declaring from the record before us that the deceased was not, during the approach of the Meteor, engaged in the performance of some duty of his position or of some order of the engineer that prevented him from observing either the presence or absence of a red light at the switch stand. Moreover, the evidence showed that, even if the lamp had been burning and the fireman had been on the lookout at the precise instant, he could have seen the light just about four seconds before it came into the view of the engineer. Nor can we assume, in the absence of evidence, that if the fireman was on the lookout, and observed that there was no light at the switch stand, he did not seasonably notify the engineer who was in charge of the engine. It is not necessary for us to determine in this case whether the engineer was or was not remiss in the performance of his duties. Even if he was, it does not follow that his negligence is imputable to the fireman, or that the right of the latter or his personal representatives to recover for the injury so caused is in any wise impaired thereby. The negligence of the engineer, if there was such, cannot be visited upon the fireman unless he concurred therein, and there must be proof, not mere surmise of such concurrence."

After a careful examination of the record, and thoughtful consideration of the arguments of counsel, we are of opinion, for the reasons given, that the case is within this general and wholesome rule. One cannot—nor can one standing in his stead—recover damages for an injury to the commission of which he has directly contributed. And it matters not whether that contribution consists in his participation in the direct cause of the injury, or in his omission of duties which, if performed, would have prevented it. If his fault, whether of omission or commission, has been a proximate cause of the injury, he—as also one standing in his stead—is without remedy against another also in the wrong, such as the railroad company here.

The judgment is reversed, with a direction to grant a new trial.

ADAMS, Circuit Judge (dissenting). I fully agree with the majority that the known violation of a rule of a railroad company adopted and promulgated to secure the safe operation of its trains amounts to such negligence as precludes recovery by any employé whose disregard of the rule occasions injury or damage to himself, and that such employé cannot excuse himself for such known violation of the rule by appeal to the doctrine of ordinary or reasonable care. An employé must, at his own peril implicitly obey all rules, whatever he or any other persons may think ordinary care on his part dictates. But a full recognition of his obligation in this respect does not, in my opinion, end inquiry in this case.

Whenever the occasion for performing an act required by a rule depends upon facts not subject to the control of the employé, and when he is required to inform himself of the existence of such facts before he is called upon to perform the act required, the doctrine of

153 F.—5

ordinary or reasonable care must apply. He cannot be required to act until he knows or in the exercise of reasonable care ought to know of the requirement.

For the purpose of determining the question whether this case should have been taken from the jury because of contributory negligence of the deceased, we must treat the evidence most favorably to plaintiff and must therefore assume under the proof that neither red nor green colored light was displayed on the switch stand; but, on the contrary, that no light of any kind appeared there.

The engineer clearly was not required to slow down the train until he ascertained, or, in the exercise of reasonable care, could have ascertained, that no light was displayed on the switch stand. On the question whether the proof so conclusively established the engineer's want of care in failing to ascertain that fact as to prevent recovery because of his contributory negligence, I differ radically from the view entertained by the majority. I do not think it so clearly appears that the engineer in the exercise of due care could have discovered the want of a light on the switch stand in time to slow down the train before it reached the switch and was derailed that all reasonable men in the exercise of an honest and impartial judgment would say so. That is the test as frequently declared by us. On the contrary, I think the facts and circumstances surrounding the engineer and the running of his train at the time in question were such as left that issue fairly debatable and rendered it particularly appropriate for the consideration of a jury. The engineer, by reason of running on a curve at the time, was not brought into a line of vision of the switch stand until he came within twelve hundred feet of it. He was running on a special order requiring him to make the unusual speed of 50 to 60 miles per hour. The night was dark, windy, and foggy. The engine had run a long distance. The windows through which he had to look were presumably affected by smoke and fog. The engineer, as he approached the switch stand, had duties to discharge in running his train which required diversified attention. The discovery of the negative fact that no light was displayed was not easy, and in itself would reasonably have taken some time.

These and other facts like them, together with the reasonable inferences deducible from them, were, in my opinion, sufficient to require the submission of the issue of contributory negligence to the jury. They were not so essentially different from those involved in the Bishard Case referred to in the foregoing opinion as to require the radically different treatment which the majority gives them. In my opinion there was less evidence of contributory negligence in this case than in that. As no other reversible error is claimed to be disclosed by the record, I think the judgment should be affirmed.