MISSOURI, K. & T. RY. CO. v. COLLIER.

(Circuit Court of Appeals, Eighth Circuit.  October 17, 1907.  On Rehearing, December 23, 1907.)

No. 2,533.

1. EVIDENCE — WEIGHT — CREDIBILITY OF WITNESSES — CONTRADICTION BY PHYSICAL FACTS.

Where the testimony of a witness is positively contradicted by the physical facts, neither the court nor the jury can be permitted to credit it.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 20, Evidence, § 2437.]

2. MASTER AND SERVANT—RULES OF RAILROAD COMPANY—VIOLATION BY EMPLOYÉ—CONTRIBUTORY NEGLIGENCE.

It is settled law that a railroad company may make reasonable rules for the government of its employés in the operation of trains, and an act of one employé, unauthorized by, or contrary to, such rules cannot justify another employé in disregarding an established rule, nor relieve him from

the charge of contributory negligence, where his disregard of such known. rule results in, or contributes to, his injury.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, §§ 759–775.]

3. SAME—INJURY TO EMPLOYÉ.

The rules of a railroad company provided that "a signal imperfectly displayed, or the absence of a signal where a signal is usually shown, must be regarded as a stop signal"; that "in all cases of doubt or uncertainty the safe course must be taken and no risks run"; and that "firemen as well as enginemen must watch signals as well as switches carefully. as frequently the first view can be had from the firemen's side." Plaintiff, who was a fireman on a passenger train of such company, on approaching a station at night, at which the train did not stop, observed when from one-half of a mile to a mile distant that there was no light displayed at a switch stand on the engineer's side of the track where there should be a light. He also saw near the station the engine of a freight train facing him with the headlight hooded, as required by the rules when such train was out of the way of an approaching train. He claimed also that some one at or near the station gave a "high ball" signal by moving a lantern up and down, which indicated "proceed" under the rules. The giving of any such signal was denied by the crew of the freight train, and was not authorized by the rules to be given to a train approaching a station. Plaintiff took no action whatever, and did' not communicate what he had seen to the engineer, and the train passed' upon a siding through the switch, which was open, and ran into a section of the freight train, and in the collision the engineer was killed and' plaintiff injured. 'Held, that in failing to act on the absence of a light at the switch, which under their rules was a stop signal, plaintiff was guilty of contributory negligence, which precluded his recovery from the company; that he was not relieved from such charge by the unauthorized high ball signal, if given, nor by the fact that it was also the duty of the engineer to see and obey the stop signal.

4. SAME—PROXIMATE CAUSE OF COLLISION.

In such case, the proximate cause of the wreck was not the absence of a light from the switch, but the fact that the switch was improperly open, the responsibility for which was a question of fact in issue.

5. APPEAL—PRESENTATION OF QUESTIONS FOR REVIEW—MOTION FOR JUDGMENT NOTWITHSTANDING VERDICT—FAILURE TO ASK DIRECTED VERDICT.

Where a defendant fails to request a directed verdict at the close of the evidence, the refusal of the trial court to enter judgment in his favor notwithstanding an adverse verdict will not be held error by the appellate court.

Hook, Circuit Judge. dissenting.

In Error to the Circuit Court of the United States for the Western District of Missouri.

This is an action for personal injury, growing, substantially, out of the following state of facts:

The defendant in error, hereinafter for convenience designated the plaintiff, was in the employ of the plaintiff in error, hereinafter for convenience designated the defendant, as fireman on passenger train known as the "Katy Flyer." He had been in the employ of the defendant as fireman for about 15 months prior to the accident, and had for a considerable time prior to this service worked as a fireman on the Missouri Pacific Railroad. The accident occasioning the injury in question occurred at Lewis Station, in Henry county, Mo.; at 1:28 o'clock a. m. of the night of September 23, 1904. The train was coming from the south going north, and was due to pass this station at about 12 o'clock that night. This train was not scheduled to stop at that station. Its usual time was fast, running from 40 to 45 miles an hour.

An order had been issued the evening of that night, for the information of other trains and crews on the road, that the "Flyer" would be an hour

and a half late at Lewis Station, and for all other crews to govern themselves accordingly. On that night there was a south-bound freight train of the defendant running so as to meet said "Flyer" at said station. Arriving at the station some time prior to the arrival of the "Flyer," the freight train had to shift from the main to the side track to give free passage on the main track. On the west side of the main track was what was known as the "passing" track, 2,334 feet between the head blocking switches. On the east side of the main track, nearer to the south end of the passing track, was the depot building. On the east side of the depot was another track, diverging from the main track, known as the "house" track, which is about 1,430 feet between the head blocks. The freight train passed on to the passing track. It became evident to the conductor, after taking observations from the top of the cars, that there was not sufficient space on this siding to stand clear of the main track at both ends, and he would therefore have to pass the south switch in order to clear the north switch with the rear end of said freight train. Accordingly he notified the head brakeman, named McCarty, to open the south switch to allow the engine and the front part of the train, consisting of seven cars, to pass out on to the main line, which McCarty promptly did. To meet this situation the engine and seven cars were cut off from the train, which left the balance of the train clear on the passing track. After the engine and seven cars had passed the south switch out on to the main track, the plan was to back these detached cars with the engine onto the "house" track. To accomplish this movement it was necessary for McCarty to throw the south switch to permit the seven cars and the engine to back through said switch north on the main track. This he did, and signaled the engineer when accomplished. The switch at the junction of the main track and the house track stood about 300 feet north of the south switch connecting the main track and the passing track, over which the seven cars and engine had just passed. The conductor of the freight train attended to the throwing of this house track switch so as to admit the cars and engine thereon. As soon as the seven cars and engine had passed onto the house track, the conductor threw the switch over which they had just passed so as to make a clear main track. As these cars backed through the south switch McCarty, standing some 10 or more feet to the north of it, discovered that there was a hot box on the rear of the seventh car of this short train, and he immediately started toward the conductor at the switch of the house track to inform him of this fact; but on account of a ditch running parallel with the railroad track the walking was difficult, and as soon as the engine in backing had passed him he immediately followed it up on the track, within 10 feet of the engine as it backed, according to his testimony, until he reached the conductor, and informed him about the hot box.

When this short train had thus passed backward and northward through the south switch onto the main track, there was no occasion for setting that switch for the free passage of the north-bound passenger train; and his testimony is that he never touched this switch after setting it for the movement of the backing of the engine and seven cars, and was not at it after he so followed up the backing train. In this he is confirmed by the fireman on the engine on the backing train, who testified that he saw McCarty going forward toward the house track switch as the engine backed north of the south switch; and the conductor confirms him in making the report to him of the hot box immediately after the engine passed through the house track switch. The conductor and the other brakeman on this car with McCarty were engaged, after the train stopped, in and about rectifying the hot box. The conductor and the other brakemen being engaged on the car, McCarty was directed to go forward to the engineer and inform him of the situation, and not to move the train until he received the signal therefor. As McCarty was thus passing to deliver this message to the engineer, the whistle of the "Flyer," coming from the south for this station, was heard, and it reached the south switch and crashed into the south end of the freight train standing on the passing track about the time McCarty reached the engineer with his message. The engine and one car at least were derailed on the passing track, and others of the north-bound passenger train were derailed on the main track, furnishing evidence that the south switch was so adjusted as to admit the engine

onto the passing track. As a result of that collision the engineer on the passenger train was killed, and the fireman (Henson Collier, the defendant in error) received personal injuries of a more or less serious character. When the engine and seven cars were left standing on the house track, the engine, being at the south end of said cars, was hooded, as required by the rules of the company.

While said passenger train was so approaching the south switch the engineer and fireman of the freight train were at their posts on the engine, and no lanterns were being used by any of the crew of the freight train, according to their positive testimony, except as they had been employed in the movements of switching the freight train, and in and about the repairs being made on said hot box. And their testimony was that none of them were on the main track after they thus passed onto the house track, and none of them employed a lantern on the main track thereafter for any purpose. The evidence further tended to show that after the accident the south switch was found to be thrown and locked for the passing track.

In order to show a condition existing at the time, in and about Lewis Station, from which it might be as reasonably inferred that the switch had been tampered with and so set after McCarty left it as that McCarty himself so re-adjusted it, the defendant introduced evidence tending to show that for several weeks prior to this accident there was a general strike of telegraph operators along the line of the defendant's railroad, and that as an outgrowth thereof considerable difficulties and interruptions of the transaction of defendant's business had occurred at Lewis Station; that the wires had been grounded so as to confuse and interfere with train orders; that trains had been held at that station for considerable time, not being able to depart therefrom until the men could get in telephonic communication with the train dispatcher at Sedalia, Mo.; that for some time, and up to within a few days before the wreck occurred, printed matter had been circulated by these strikers along the line of defendant's road and on its trains warning the public not to patronize the defendant's road, because of its dangerous condition. And there was evidence to the effect that keys to the switch locks were sometimes carried off by brakemen or lost, and thereby could easily get into the possession of parties not entitled to them. Other essential facts will appear in the opinion of the court. On trial to a jury the plaintiff was awarded a verdict for $15,000.

George P. B. Jackson, for plaintiff in error.

Edwin Silver (C. C. Lawson, Sangree & Bohling, and Silver & Brown, on the brief), for defendant in error.

Before SANBORN and HOOK, Circuit Judges, and PHILIPS, District Judge.

PHILIPS, District Judge (after stating the facts as above). In the original petition, filed November 4, 1904, the negligent acts imputed to the defendant as the basis of recovery were: (1) the failure of the agents and servants in charge of said freight train to so adjust and set the south switch at Lewis Station as to permit the passenger train to pass through; and (2) the failure to have "a light at said switch so as to enable the plaintiff to see whether or not said switch was properly adjusted and set." The defendant answered this petition on the 25th day of November, 1904. Thus the issues stood until the third Monday in March, 1906, when the plaintiff filed an amended petition, alleging as further grounds of negligence that the defendant so hooded the headlight on the freight engine where it stood on the house track as not to disclose that the track at the station was not clear and unobstructed for passing trains; and, further, that as the passenger train approached said station the defendant's agents and serv-

ants carelessly and negligently signaled to the agents and servants of the passenger train to come ahead on the main track. The answer to the amended petition, after admitting that the plaintiff was in its employ as such fireman, tendered the general issue, and alleged contributory negligence on the part of the plaintiff.

On the trial the plaintiff put in evidence the rules of the defendant company, among which are the following:

### "General Notice.

"To enter or remain in the service is an assurance of willingness to obey the rules.

"Obedience to the rules is essential to the safety of passengers and employés, and to the protection of property.

### "General Rules.

"A. Employés whose duties are prescribed by these rules must provide themselves with a copy.

"B. Employés must be conversant with and obey the rules and special instructions. If in doubt as to their meaning, they must apply to proper authority for an explanation.

"C. Employés must pass the required examinations.

"D. Persons employed in any service on trains are subject to the rules and special instructions.

"E. Employés must render every assistance in their power in carrying out the rules and special instructions.

"F. Any violation of the rules or special instructions must be reported."

### "Signal Rules.

"8. Flags of the prescribed color must be used by day, and lamps of the prescribed color by night.

"9. Night signals are to be displayed from sunset to sunrise. When weather or other conditions obscure day signals, night signals must be used in addition.

| Color. | Indication. |
| --- | --- |
| (a) Red | Stop. |
| (b) White | Proceed, and for other uses prescribed by the Rules. |
| (c) Green | Proceed with caution, and for other uses prescribed by the Rules. |
| (d) Green and White | Flag stop. See Rule 28. |
| (e) Blue | See Rule 26. |

Hand, Flag and Lamp Signals.

| Manner of Using. | Indication. |
| --- | --- |
| (a) Swung across the track. | Stop |
| (b) Raised and Lowered vertically, | Proceed. |

"17. The headlight will be displayed to the front of every train by night, but must be concealed when a train turns out to meet another and has stopped clear of the main track, or is standing to meet trains at the end of double track or at junction points."

"Use of Signals.

"27. A signal imperfectly displayed, or the absence of a signal where a signal is usually shown, must be regarded as a stop signal, and the fact reported to the superintendent or train master."

"106. In all cases of doubt or uncertainty the safe course must be taken and no risks run."

"345. Firemen as well as enginemen must watch signals as well as switches carefully, as frequently the first view can be had from the fireman's side."

The plaintiff testified that the time card in which were printed all the rules for the government of the employés was delivered to each member of the crew, and he had the time card then in force, from which the above extracts of the rules are copied. When he entered the service of the defendant company he made application for employment containing statements as to his qualifications, after which he made acknowledgment and agreement as follows:

"I hereby acknowledge receipt of a copy of the rules and regulations for the government of employés of the M. K. & T. Railway Company and all amendments thereto, and a copy of the current time table, and agree to familiarize myself with and observe the same and to keep advised of such amendments to said rules as may hereafter be made."

He testified that he had complied with this statement, and had kept himself informed as to the rules governing the duties of firemen and other trainmen.

The plaintiff in his own behalf testified that on approaching Lewis Station from a half to a mile therefrom he had a full view of the station; that he perceived the presence there of the engine on the freight train, and could tell from the light coming out from the sides of the hood that the engine was hooded. He further testified that at that distance he discovered there was no light on the switch stand or at the switch; that he saw the lantern, and it was not lighted where the evidence showed such signal light was customarily displayed. He knew that under the requirements of rule 27 "a signal imperfectly displayed, or the absence of a signal where a signal is usually shown, must be regarded as a stop signal." He therefore had warning that his train ought to stop at the very gateway of the passage through Lewis Station; and the evidence was that at the distance where he discovered the absence of the signal light there was ample time to have so checked up the train as to have avoided the accident. The rule of the company furthermore declared that "firemen as well as enginemen must watch signals as well as switches carefully, as frequently the first view can be had from the fireman's side." He neither heeded the warning signal of the absence of a light at the switch, nor did he speak to the engineer calling his attention to the fact. This was culpable negligence on his part. St. Louis & San Francisco Railroad Co. v. Dewees, decided by this court, 153 Fed. 56, 82 C. C. A. 190.

To excuse himself from this failure to observe a known, positive rule of his employer, the observance of which would have prevented this disastrous accident, it seems to have occurred to him a year and five months after stating his grievances against the defendant company, predicated alone of the improper adjustment of the south switch and the absence of any light thereat, that he was enticed into the dan-

ger trap by reason of the fact that as he approached the station he saw, as he thought, on the main track near the station, a "high-ball" signal, which he assumed to have been given by some employé of the railroad company, which he understood meant to come ahead.

Viewed merely as a question of fact, the burden of proof devolved upon the plaintiff to show that if such signal was given it was by some servant or agent of the defendant, and under circumstances for which the law would attach liability therefor to the defendant company. It challenges the credulity of the intelligent mind that if the plaintiff observed and acted on such signal, so conspicuous a fact was not uppermost in his mind when he first imparted to his counsel the facts for drafting the original petition. On the contrary, it does not appear to have been communicated by him to his attorneys for about a year and a half after the accident. On the other hand, every employé of the company in and about the station testified that no one of them gave any such signal at the time and place. This is confirmed by the detailed, harmonious statements of all of them as to how they were engaged and occupied at the time. The engineer and fireman on the freight train were at their station on the engine, the conductor and the two brakemen were occupied in preparing for and working at the hot box, and McCarty was sent therefrom with a message, demanding haste and attention, to the engineer on the engine, and before that commission was executed the "Flyer" approached and crashed into the freight train.

The improbability of such high-ball signal having been given by any such employé is accentuated by the fact that there was no conceivable reason why such signal should have been given. The freight train crew, beyond the possibility of debate, assumed that the main track was clear for the passing through of the "Flyer." And there was no rule of the company imposing upon any employé of the defendant any such duty. The work and duty of the freight train crew were about their own train. They had no other duty to perform toward the incoming train than to clear the main track, set the switches therefor, and hood the engine.

The plaintiff introduced a witness named Bogard, whose residence was about 300 feet from where the conductor and the switchmen were occupied about the detached engine and cars, who, remarkably enough, chanced to be outside of his house at that hour of the night. He testified that about the time of the coming of the passenger train he observed the up and down motion of a lantern over towards the south switch of the main track. As the cars on the house track stood between him and the main track, the physical facts render his testimony too utterly incredible for any court to suffer it to be the basis of a verdict and judgment. Where a witness' testimony is positively contradicted by the physical facts, neither the court nor jury can be permitted to credit it. Gurley v. Railroad, 104 Mo. 211, 16 S. W. 11; State v. Dettmer, 124 Mo. 426, 27 S. W. 1117; McLachlin v. Barker, 64 Mo. App. 511; Kelsay v. Railroad, 129 Mo. 362, 30 S. W. 339; Huggart v. Railroad, 134 Mo., loc. cit. 679, 36 S. W. 220; Payne v. Railroad, 136 Mo. 583, 38 S. W. 308; State v. Gurley, 170 Mo., loc.

cit. 432, 70 S. W. 875; Petty v. Railroad, 179 Mo. 666, 78 S. W. 1003; Waters-Pierce Oil Company v. Van Elderen, 137 Fed. 557, 70 C. C. A. 255.

It is but just, perhaps, to this witness to say that as he went out into his yard about 12 o'clock the light he saw was in connection with the movement of the freight train and the passing thereabout on the house track of the crew with lanterns in their hands; and he confused these with the instant of the coming in of the passenger train.

· If it be conceded that these matters should have been submitted to the jury, the important question is, was the fact of the appearance of the high-ball signal sufficient as matter of law to render the defendant company responsible for the plaintiff's injury? "When a railroad company has deliberately adopted a system of rules, which have been made familiar to its employés, and its railroad is operated under them, the reasonableness and sufficiency of these rules are questions of law, and not of fact. These questions must be determined by the court, because there is no other way in which a set of rules may ever be established or adjudicated as either reasonable or sufficient." Little Rock & M. R. Co. v. Barry, 84 Fed. 944, loc. cit. 949, 28 C. C. A. 644, 43 L. R. A. 349.

As an artificial being, like a railroad, has no eyes to see, no ears to hear, no mouth to speak, no hands to act, it can only exercise such faculties and exert its powers through the instrumentality of its managing officers and their employés. For the performance of its functions, the betterment of the service, the protection of its property and the lives and limbs of its employés and the passengers committed to its care, it is authorized to prescribe reasonable rules and regulations, and to insist upon their faithful observance and enforcement by its employés. This is well expressed in Lake Erie & W. R. Company v. Craig, 80 Fed. 495, 25 C. C. A. 585:

"The doctrine that the master, operating a complicated and dangerous business, may and must make reasonable rules for the guidance and safety of the employés, that the employé must yield obedience, and takes upon himself the consequences of disobedience, is a doctrine that is eminently wise, and founded upon the highest considerations of justice and humanity. The master's right to protect himself from heavy pecuniary liability in the operation of a large business is most important. His duty, by suitable regulations, such as are suggested by experience, to protect as far as may be the servant from risk of injury to himself as well as injury from a fellow servant, for which the master is not pecuniarily liable, and for which there is practically no remedy, is a duty justly imposed by law. And the still higher considerations of the preservation of human life, and the prevention of serious physical maiming and disability with the attendant suffering and the impairment of usefulness, furnish the fullest support and sanction to the doctrine. And the law knows no such incongruity as holding the master to the duty of making, with the right of making, without at the same time requiring from the servant full conformity to, the regulations."

In Wolsey v. Railroad Company, 33 Ohio St. 227, the court said:

"These companies are held to a severe line of responsibility for the acts of their servants, upon the idea that the act of the servant is the act of the master, because the master has told the servant exactly what to do, and he has done it. Certainly the whole law, qui facit per alium, etc., depends upon the idea of obedience to orders. · The conduct of a gigantic corporation, with hundreds and thousands of employés, is not unlike that of an army. Its en-

tire action depends upon the fact that the commands emanating from authority are to be complied with by every one subordinate to that authority."

The defendant had prescribed the signal at the very switch where this accident occurred. While a light at the switch showing certain colors on the disk was required by the rule, a white light indicating safety, red to stop, green to proceed cautiously, the defendant anticipated the very contingency which arose in this instance, the possibility from some cause or other that the light which should be there might be broken, displaced, extinguished, or negligently omitted by the person entrusted with its care; and therefore, as a precautionary measure, it prescribed that "a signal imperfectly displayed, or the absence of a signal at a place where a signal is usually shown, must be regarded as a stop signal." Notwithstanding this rule was known to this fireman, and notwithstanding he discovered the absence of any light from one-half to one mile from the station, he elected to rely upon the high-ball signal, merely supposed by him to have been given by some person in the yard beckoning him to come on. On the witness stand the following occurred on cross-examination of the plaintiff:

"Q. Can you turn to any place in these rules which says that such a signal shall be given for a train approaching a station along the switches that they use there? A. No, sir. Q. Don't you know there isn't any such thing? A. I know; but they do do it sometimes. Q. You know there is no such provision in the rules? A. Yes, sir."

On the other hand, all the crew, witnesses on behalf of the defendant, testified that there was no such usage or custom, for the palpable reason that such signals were used in the movement of trains on sidings, and consequently ought not to be confused by application to an incoming passenger train. And to this end, the evidence showed that a bulletin order had some years prior thereto been issued by the company prohibiting such use of signals; but the plaintiff testified that he was not aware of such bulletin. The defendant company, however, had done all it could to have its rules observed in respect of its signals.

It would be an intolerable doctrine that forsooth some of the employés of the railroad company sometimes gave a signal, not prescribed or sanctioned by the employer, it might be followed, not at the risk of the employé but that of the master. No such sporadic act of the employé, unauthorized by and unknown to the master, could constitute a precedent for disregarding an established rule. Abel v. President, 103 N. Y. 581, 9 N. E. 325, 57 Am. Rep. 773; Russell v. Richmond & D. R. Co. (C. C.) 47 Fed. 204. In A., T. & S. F. R. Co. v. Reesman, 60 Fed. 370, 378, 9 C. C. A. 20, 23 L. R. A. 768, Mr. Justice Brewer said:

"The duty of obedience to the rules of the employer is one resting alike upon all employés; and when an employé claims to recover from his employer for injuries resulting through the latter's negligence, he cannot escape the consequences of his own act contributing to such injury—an act done in known violation of the rules of such employer—on the ground that his immediate superintendent knew and assented to such act of violation. If it were otherwise, then the supineness and negligence of any superintending officer of a corporation would relieve a subordinate from responsibility for his own conduct. In other words, the wrong of one employé is excused by a like wrong

of another. The employé injured through his own omission of duty escapes liability for such omission because some other employé is equally careless. The question has not infrequently arisen whether knowledge and assent on the part of the conductor, or other official on the train, of a violation of one of the rules of the company by a passenger, relieves the latter from the burden of contributory negligence arising from such violation, and the response has almost uniformly been in the negative. It is true that in some cases the party injured was not an employé, subject to the control of the officer whose knowledge and assent to the violation was relied upon as an excuse, but the principle underlying is the same. The question is not one of obedience to orders, but of a compliance with rules; and, generally speaking, the duty of compliance is not waived by the mere fact that some controlling official has knowledge of the failure to comply."

In respect of this issue in the case the defendant made the following request for direction to the jury:

"The court instructs you that under the plaintiff's evidence the second ground of negligence, namely, signaling to the passenger train to come ahead on the main track, cannot be regarded as the cause of the accident in which the plaintiff was injured, and there can be no recovery in this case on that ground."

This the court refused, but in its charge said to the jury:

"You should further consider any fact, if you find it to be a fact from a preponderance of all the testimony, any signal that might have been given by any party to direct the passenger train to proceed."

This, it will be observed, did not even require that the jury should find that the signal was given by any servant or agent of the defendant, but if given by any party it might be considered in forming a verdict.

Criticism is made of this request in that it asserted that such signaling cannot be regarded as the cause of the accident, as it is inconsistent with the contention of defendant's counsel that the heeding of the signal by the plaintiff caused the injury, and because it contained more than a single proposition. The position of defendant's counsel is that no such signal was given by any servant or authority of the defendant, and if given could not be regarded as the cause of the accident, for the palpable reason that the more direct cause of the injury was the known disregard by plaintiff of a positive rule of his employer. The contributory negligence asserted by the defendant is that the injury resulted from the plaintiff's failure to observe one of its published rules known to him. If he saw fit to act upon some other notice, unauthorized by the defendant, such as the claimed high-ball signal, the contributing cause to the accident was the failure to heed the absence of the target light.

Moreover, the defendant further requested the court to charge the jury "that the only ground of negligence alleged in the petition which you can inquire into in this case is the first one to the effect that the agents and servants of the defendant had failed and omitted to properly set and adjust the switch for the passing track."

As the court gave the request made by defendant that permitting the freight train to stand on the side track with the headlight of the engine hooded afforded no ground of recovery, as that was done in compliance with a known, published rule of the company, the only question left in the case was as to the setting of the switch and the failure to

maintain a light thereon. As will be shown hereafter, the failure to have such light there was not the cause of the accident.

It is suggested that the defendant did not frame its requests in such form as to have them separately given, but put them rather in the form of a connected charge, to be given totidem verbis as a unit. The requests as made contained separate and distinct propositions of law, based on several independent grounds of negligence alleged in the petition; and the bill of exceptions shows that the court granted the request in respect of the fourth ground, that is, as to the hooding of the engine, "but as to the second and third grounds of negligence the court refused the requests made by the defendant," setting out these requests separately as above stated and exceptions were saved to the refusal of each request. And the court evidently regarded them as separate and independent requests for he said in his charge:

"Certain requests in matters of law have been made by counsel for the respective parties. I have given such as I deem appropriate in this charge which I am now giving you, and therefore refuse the requests made."

Counsel for plaintiff very ingeniously undertake to escape from the dilemma of the plaintiff acting upon the high-ball signal rather than the warning given him by the absence of the switch light, by suggesting that as the engineer as well as the fireman was in position to have observed the absence of any light at the switch no negligence is imputable to the plaintiff for not warning the engineer in charge of the throttle and the lever. The authorities cited in support of this contention (Aerkfetz v. Humphreys, 145 U. S. 418, 12 Sup. Ct. 835, 36 L. Ed. 758; Hutchinson v. Railroad Company, 161 Mo. 246, 61 S. W. 635, 852, 84 Am. St. Rep. 710; New York Central & H. R. R. Company v. McGrath, 151 Fed. 436, 80 C. C. A. 666) have no application to an instance like this, where the rule of the company required that "firemen as well as enginemen must watch signals as well as switches carefully, as frequently the first view can be had from the fireman's side," and, further, "in all cases of doubt or uncertainty the safe course must be taken and no risks run." What would be the sense or meaning of such a rule, if after the fireman, as a result of his vigils, discovered a warning signal, he should then shut his eyes and his mouth, and go on to impending death or injury, on the accountability to him of the company for his life or his limbs, and possibly those of every fellow servant and passenger under his protection? The clear meaning and purpose of imposing such obligation upon the fireman was to safeguard the property of the railroad company, and the lives and limbs of the crew and passengers against the possible oversight or neglect of the engineer.

The distinction between this and the case of St. Louis & San Francisco Railway Company v. Bishard, 147 Fed. 496, 78 C. C. A. 62, is so palpable as hardly to justify discussion. That case was based largely upon the proposition that there was no evidence showing that as a matter of fact the fireman discovered the absence of any light at the switch board, and because of the further fact that owing to the position of the switch board from his side of the engine, and the fact that at the particular instant his duties called his attention away from such

observation, contributory negligence on his part was not inferable. Whereas, in the case at bar, the plaintiff's own testimony showed affirmatively that he did discover the absence of the light from a half to a mile distant, and he took no action on that information whatever, when the evidence shows that the speed of the train could have been so slackened within a quarter of a mile as to have prevented the accident. See in this connection St. Louis & San Francisco Railway Company v. Dewees, supra.

In respect of the third ground of negligence, the defendant requested the court to charge the jury as follows:

"That under the plaintiff's evidence, consisting of his own testimony and the rules introduced in connection with his testimony, the absence of a light from the switch had the same effect and was to be treated the same as a red light, and was a warning to the men on the passenger train to stop; and therefore the absence of the light from the switch cannot be regarded as negligence which was the proximate cause of the injury to plaintiff, and there can be no recovery on that account."

The first part of this request, as we have already shown, was but declaratory of the express rule of the defendant company. The absence of the light was equivalent to a warning then given to the engineer and fireman to stop. The absence of the light was not the proximate cause of the injury. It did not cause the collision. This is obvious as but for the improper adjustment of the switch the engine of the passenger train would not have run into the freight cars standing on the siding or passing track. Viewed independently of the contributory negligence of the plaintiff, if the switch had been properly set, the accident would not have occurred, even though the engineer and fireman had proceeded regardless of the absence of any light.

Notwithstanding the defendant may have been entitled to an instructed verdict on the issue respecting the condition of the south switch, it is not in position to complain, for the reason that it did not make such request at the close of the evidence before the submission of the case to the jury. The verdict was returned on the 23d day of March, 1906, and not until the 27th day of that month did the defendant file motion for new trial, and also a motion that the court enter judgment for the defendant notwithstanding the verdict. In this jurisdiction no error is predicable of the action of the trial court in denying a motion for new trial. We are not disposed to encourage the practice of a party in taking chances with the jury for a favorable verdict, and when disappointed at the result four days thereafter asking the court, in effect, to set aside the action of the jury and enter a verdict for one of the parties.

It results that the judgment of the circuit court must be reversed, and the cause remanded, with direction to proceed in conformity with this opinion.

HOOK, Circuit Judge (dissenting). Taking the verdict of the jury as settling, for an appellate court, facts supported by substantial evidence and reasonable inferences therefrom, this is the case: A southbound freight train of the railway company reached the village of Lewis, Mo., shortly after 1 o'clock at night, and was then cut into two

parts, one of 44 cars including the caboose, and the other of the engine and 7 cars, and disposed upon sidings to leave a clear main track for a fast north-bound passenger train due to pass through the station shortly afterwards. The switches connecting the sidings with the main track were used in the movement of the freight train. When all was apparently in order the passenger train approached the station at a speed of from 40 to 45 miles an hour. It was running under special orders, had the right of way, and was to pass without stopping. When the passenger train reached the south switch which had been manipulated by one of the freight brakemen, it was diverted from the main track to one of the sidings and crashed into the end of the 44 cars. The engineer was killed, and the fireman was injured. After the wreck it was discovered that the brakeman of the freight train, instead of leaving the switch lined up with the main track, had thrown it for the siding and locked it with the spring lock used in such cases. The action was brought by the fireman to recover damages for his injuries. Under the Missouri law, controlling here, the criminal negligence of the brakeman was chargeable to the railway company, that is to say, the fact that he was a fellow servant of the injured fireman does not prevent recovery. So far this would seem to be a clear case, but it is said the fireman was guilty of contributory negligence because there was no signal light at the south switch where one should have been. The fireman perceived that fact, and under a rule of the company the absence of the light was a stop signal which he should have obeyed. It is true there was no signal light at the switch. The company had intrusted the maintenance of the switch lights at Lewis Station to a boy 11 years of age, and his excuse for the default was that the section foreman paid no attention to his requests for signal oil, and being without it he had left the lamps at his father's store in the village. It is also true that a rule of the company provided that the absence of a signal at a place where one is usually displayed is a stop signal. But this is what the fireman saw as the passenger train approached the station: He saw that a freight train was there and had apparently been arranged so as to insure safety to the passenger train. He saw a faint line of light around the headlight of the freight engine fronting south, showing that it had been covered in accordance with a rule of the company to indicate that the train was clear of the main track. He saw the lights of the trainmen about the station grounds, and that one of them signaled the approaching train by raising and lowering his white lantern vertically, a signal commonly called the "high-ball," which under a rule of the company meant "proceed." Had there been a lighted lamp at the switch showing red down the track, it would have been a danger signal; had it shown white, it would have indicated safety. Concisely stated, these are the facts in the case, with one important exception to which I will refer hereafter. I will not discuss the evidence further than to say that a careful study of the record has convinced me that it was clearly sufficient to authorize the jury to find the facts as narrated above. Should we who are not triers of the fact say as matter of law that the fireman was guilty of negligence contributing to his injury because, observing the

absence of a light at the switch, he acted upon the information imparted by the shrouded headlight and the signal to proceed?

Of course rules and the observance of them are necessary for the safe operation of a railroad, but the problem presented to the railroad man is always a practical, never a scholastic, one. If he stopped to split hairs he would be useless in the service. He is required to act quickly, frequently in emergencies, and always in the light of conditions surrounding him at the time. Under the controlling law of Missouri the company was responsible to plaintiff for the conduct of the trainmen of the freight train, of the boy who left the signal lamps at his father's store, and of the section foreman who neglected to give him oil; and I think that in this case, peculiarly circumstanced as it is, such a condition of affairs was presented to the plaintiff as prevents us from saying as matter of law that he was negligent.

It is fairly debatable whether the signal given by the covered headlight that the freight train on the sidings was clear of the main track was not false and misleading, the fact being that a switch used by it in taking the siding and lying between it and the on-coming train was so thrown as unavoidably to cause a collision. True, the freight train was in the clear in the sense that none of its cars physically encroached on the main track, but was that all that the shrouded headlight signified? Is it unreasonable to say that such a signal meant the freight cars were out of the way of the passenger train? In fact the main line was not passable. With the switch thrown as it was the freight cars on the siding became an obstruction that meant a wreck, as much so as if they had been left standing on the main track itself.

Again, the "high-ball" signal was clearly a false and misleading one. It is said that such signal is not intended for a train on the main line when approaching a station. It is true the rules do not say it is. Neither do they say it is not. They do say, however, that a signal given by vertically raising and lowering a lamp signifies "proceed," and the use of the signal is not limited in the rules. A natural and practical construction of this rule by railroad employés, making it applicable to the situation as plaintiff saw it, was abrogated, it is said, by a bulletin of the company; but the bulletin, if there was one, was not brought to plaintiff's attention, and he was not charged with knowledge of it. As to him the bulletin never existed. I apprehend the case would not have been different if the trainman who gave the "high-ball" signal had, instead, hung his white lamp at the misplaced switch to take the place of the light usually displayed there. So far as the rules shown in the record are concerned, the information conveyed by one was also conveyed by the other. For aught the plaintiff knew, the "high-ball" signal to proceed was given by one of the trainmen having possession of the station grounds for the very reason that there was no light at the switch. We should look at the case, not with that wisdom which comes after the accident, but from the standpoint of a man, reasonably intelligent and careful, knowing the rules and under duty to obey them, who, being confronted by the conditions which the plaintiff observed, is called upon to act.

I come now to the remaining feature of the case, and it may be assumed in considering it that no "high-ball" signal was given as claimed

by the plaintiff. It is said in the opinion of the court that the fireman "neither heeded the warning signal of the absence of a light at the switch nor did he speak to the engineer calling his attention to the fact. This was culpable negligence on his part." I think there is an error in this. There is nothing in the record indicating that the fireman did or did not impart his knowledge to the engineer. It being his duty to do so, I doubt that it is our right to presume in the absence of evidence that he did not perform his duty. Rather, the presumption is that he did his duty. More than this, the question pertains to a defense of contributory negligence, and if the failure to inform the engineer is important in this respect, it was the duty of the company to show it by evidence. The burden of proof is not sustained by the absence of evidence. I pass by the fact that the passenger train approached the station upon a straight track, that the switch stand from which the signal light was missing was upon the engineer's side, and that his opportunity to discover its absence was even better than that of the fireman. If there is no presumption that the engineer was not informed by the fireman of the absence of a light, then the logic of the court's opinion is that in order to escape the imputation of contributory negligence the fireman should have jumped from the engine or wrested control of it from the engineer. Yet we all know that the fireman is subordinate to the engineer and subject to his orders.

Although the railway company did not ask the trial court for a directed verdict, nevertheless the clear import of the foregoing opinion is that there should have been no recovery. This being so, I am constrained to express my dissent.

## On Rehearing.

PHILIPS, District Judge. The first proposition advanced in support of this petition, when reduced to its essence, is that as no objection was interposed in limine either to the predication of a right of recovery respecting the alleged giving of the "high-ball" signal, and no objection was made by the defendant to the introduction of evidence by the plaintiff in support thereof, the defendant was precluded from asking the court to withdraw its consideration from the jury, and that the jury would therefore be warranted in predicating a verdict thereon. This proposition is not even builded on sand. As the matter which rendered unavailing the "high-ball" incident was found in the rules of the company, and those rules were not pleaded by the plaintiff, no objection predicated thereon could have been made by the defendant at the inception of the case. In presenting a prima facie case the plaintiff tendered proof of the case as presented on the face of the pleadings, without disclosing the existence of the rules of the company in question. Those rules did not come into the case until introduced by the defendant in developing its defense. When the evidence closed with both facts before the court touching this issue, the defendant had its first opportunity of raising the question of law as to the effect of this proof. As shown by the opinion of the court, this was promptly raised by request for a declaration of law. This was the opportune and proper way of presenting it to the court for

consideration. We adhere to what is said in the majority opinion as to the law applicable to the plaintiff's alleged reliance upon the "high-ball" signal.

The other ground upon which a rehearing is urged is that the majority opinion erred in holding that the plaintiff was guilty of contributory negligence in not warning the engineer of his discovery of the absence of any signal light at the switch. It is but mimic war to place the soldiers of the adversary in an indefensible position and then demolish them. It was neither stated nor assumed in the majority opinion that where the engineer in charge of the engine neglects to keep vigil and take notice, whereby the train is wrecked, his negligence should be imputed or carried over to his fireman. Nor was it asserted that the failure of one workman to warn his fellow workman of a danger as obvious to the latter as to himself would charge him with a responsibility for the inattention or recklessness of the other. The gist of the ruling of this court was and is that where, under the rules of the master, as in this case, the duty was imposed upon the fireman to keep a vigilant lookout for signals established by the master at switches on approaching a station, equal with that imposed upon the engineer, it was designed as a cumulative means of security to the train, and that, under such a known, positive obligation laid upon the fireman, he was as much bound as the engineer to take immediate action on discovering the danger to avoid it, and therefore it was his own direct negligence to stand mute and inactive, depending upon the observation and exertion of the latter to save him, when he saw and knew that the engineer was dashing heedlessly on to certain death. In other words, he was as much responsible for his silence and non-action under such circumstances as a fellow traveler, of equal authority with the driver of a vehicle, who heedlessly drives onto a railroad track, and is thereby injured, without protest or effort by the fellow traveler to avoid the danger. Davis v. C., R. I. & P. Ry. Co. (C. C. A.) 159 Fed. 10, recently decided by this court.

Clearly enough the record discloses: (1) That the plaintiff merely assumed that the engineer saw what he terms the "high-ball" signal; and (2) that he knew the engineer was paying no heed to the absence of the light at the switch. He testified as to what occurred between him and the engineer at the time; that after the engine whistled for the station, about a mile off, they saw the train on the siding, and the lights about it, and what he conceived to be the "high-ball" signal. Also:

"Q. Well, now state what occurred? A. And he told me—he said: 'Get down and get busy. We got to use her across here.' Q. What did he mean by that? A. Use the steam on the engine. Q. What did he mean by you getting busy? A. Well, he meant for me to get down and put in a fire. Q. Put in coal? A. Yes, sir. Q. Go ahead. A. So I got down and put in the first fire then, and just put in a light fire, two or three scoops of coal, and shut the door. When I put in the second fire he jumped off the seat box and says: 'My God, jump!' I kind o' looked up at him. I was bent over the door, or stooped down. I looked at him, and as I did I seen him jump out the gangway. At about that time the engine gave a lunge and throwed me right over on his side."

He had testified that he discovered from one-half to one mile back that there was no light on the switch stand; and then after the fore-

going testimony he testified that from the time he saw the "high-ball" signal until the collision "it couldn't have been but a few seconds." The conclusion, therefore, is inevitable that, notwithstanding the discovery by him of the absence of any light at the switch, the engineer went on directing the plaintiff to fire up, which he did up to "but a few seconds" before the collision, knowing that the engineer was not taking heed of the absence of the switch light by his not slowing up.

We feel profoundly impressed with the supreme public importance of holding the employés of railroads, in positions such as occupied by engineers and firemen in charge of trains, to a rigid accountability for the observance of the reasonable and wise rules of the company in the running of its trains. Such rules enter into the conditions of the employment and the consideration of the higher wages they receive. They should diligently keep and observe them, designed, as they are, not only for the protection of the master's property, but of the lives and limbs of the multitude of people intrusted to their con·stant vigilance and carefulness. It is a matter of common notoriety that a very large per cent. of the frightful disasters, carrying death and destruction in their wake, on the railroads of the country, is attributable to the inattention of those in charge of the operation of the trains to explicit rules and orders of the managing officers. Such disasters will not be lessened by awarding damages to those whose inattention to such rules of the master contribute to the misfortune.

The petition for rehearing is denied.

HOOK, Circuit Judge, dissents.